GALVESTON WHARF COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 39511.   Promulgated April 28, 1931.

*Fred R. Angevine, Esq.,* for the petitioner.
*R. W. Wilson, Esq.,* for the respondent.

1314

**1316**

OPINION.

MARQUETTE: This proceeding presents five issues, which will be discussed and decided in the order in which they are set forth in the preliminary statement herein.

The first relates to the amount which should be included in the petitioner's invested capital on account of the three tracts or parcels of land which it acquired in 1869 for shares of its capital stock. The petitioner contends that the amount to be included is the par value of the stock, or $622,200 for the first tract, $200,000 for the second tract, and $550,000 for the third tract. The respondent has allowed the amounts of $346,050, $120,000, and $330,000, respectively.

The petitioner is entitled to have included in invested capital for 1920 and 1921 on account of the three tracts of land in question, their actual cash value at the time they were acquired by it. Section 326 (a) (2) of the Revenue Act of 1918, and section 326 (a) (2) of the Revenue Act of 1921. However, the burden is upon the petitioner to show that their value was greater than the amount the respondent has determined and allowed, and it has failed to meet that burden. The only evidence presented by the petitioner as to the first tract is the decree of the District Court of Brazoria County, Texas, ordering the petitioner to issue to the city of Galveston 6,222 shares of its capital stock of the par value of $622,200 for said land, but there is no evidence that either the land or the stock had, or was considered by the Court or the parties to the suit to have, the value now claimed by the petitioner. As to the two other tracts of land, the evidence clearly tends to sustain the value placed upon them by the respondent. The deeds expressly recited that the 2,000 shares and the 5,500 shares of the petitioner's capital stock issued for these tracts were valued at $120,000 and $330,000, respectively,

which are the values placed upon them by the respondent. We see no reason for assuming, as we are urged to do by the petitioner, that these recitals of value were made in the deed in order to reduce the Federal stamp taxes. On the contrary, we think it should be assumed that the recitals in the deed are true, until the contrary is shown. On this issue the respondent must be sustained.

The second question is whether the respondent erred in reducing the petitioner's invested capital for 1920 and 1921 on account of depreciation sustained but not taken in prior years. The evidence on this point is that the petitioner took no depreciation during the years 1901 to 1919, inclusive, but that during that period it expended more than $2,400,000 in maintaining, repairing, replacing, renewing and improving its properties, all of which was charged to expense; that the effect of these expenditures was to keep the properties in a high state of efficiency and condition and at full value, and that the expenditures were larger in amount than the depreciation which the respondent claims was sustained in the period 1901 to 1919, inclusive. In other words, the expenditures made, but not capitalized, were more than sufficient to offset the depreciation sustained. On several occasions we have considered situations similar to that now presented. *H. Northwood & Co.*, 4 B. T. A. 697; *Lockport Paper Co.*, 9 B. T. A. 601; *Union Co.*, 14 B. T. A. 1310. In the case of *H. Northwood & Co.*, *supra*, it was stated:

Although the taxpayer was organized in 1906, it never charged off any amount for depreciation of depreciable assets prior to 1918. By reason of this fact the Commissioner, in computing the taxpayer's invested capital for 1918 and 1919, reduced the invested capital shown upon the return in the amount of $33,182.74 to cover alleged depreciation of plant for years prior to 1918. The taxpayer alleges error in this regard. The original records of the taxpayer for the years prior to 1918 have through accident, as indicated in the findings of fact, been destroyed. It appears, however, that it has been the practice of the taxpayer to charge most of the cost of improvements, renewals, replacements, and repairs to expense prior to 1918; that the taxpayer's plant had been well maintained and extended, and it also appears that, for the four years prior to 1918, improvements costing $68,100.36 had been charged to expense. The cost of such improvements was in no wise reflected by the taxpayer's capital account on its books. It is true that certain additions to the plant in the past had been capitalized, but it is equally true that the charging to capital of the cost of improvements was the exception rather than the rule. We conclude from the evidence before us that actual depreciation sustained during the years prior to 1918 had been more than offset by the cost of improvements, renewals, and replacements charged to expense. We are, therefore, of the opinion that the true earned surplus of the taxpayer at December 31, 1917, was not less than that shown by the taxpayer's books of account so far as relates to depreciation of depreciable assets, and that the reduction of invested capital made by the Commissioner in the amount of $33,182.74 to care for depreciation not shown to have been charged off on the taxpayer's books of account was in error.

In the case of *Lockport Paper Co.*, *supra*, this Board stated:

The evidence offered by petitioner in depositions shows that prior to 1909 the depreciation of its property was made good by charging renewals and certain additions and betterments to expenses. This evidence is sufficient to satisfy us that the cost of such renewals, and additions and betterments, was at least equal to the depreciation that occurred in that period.

And in *Union Co.*, *supra*, it was stated:

The next issue relates to the action of the Commissioner in reducing petitioner's invested capital for the fiscal year ended in 1921 for depreciation claimed to have been sustained between July 7, 1913, and January 31, 1916, and not written off on the books. While the depreciation charged off on the petitioner's books during that period would appear to have been insufficient, the uncontradicted testimony is that there were additions made during that period which were never added to the account and which, together with the depreciation written off, were sufficient to maintain the assets at the figure carried on the books. In such circumstances we are of the opinion that the Commissioner erred in reducing invested capital for alleged insufficient depreciation.

To the same effect is the case of *Nashville, Chattanooga & St. Louis Ry. Co.* v. *United States*, 269 Fed. 355. We are satisfied from the evidence that the amounts expended by the petitioner during the period 1901 to 1919, inclusive, for renewals, replacements and betterments was at least equal to the depreciation that occurred in that period, and that the respondent erred in reducing the petitioner's invested capital for 1920 and 1921 on account of said depreciation.

The petitioner asks that there be added to its invested capital for 1920 and 1921 the amount of $766,850.21, representing alleged expenditures in prior years for dredging and filling. At the hearing it was stipulated that the total cost of dredging and filling for the years prior to 1901, as reflected by the petitioner's books, was $497,-158.97, of which amount $222,096.05 was capitalized and $275,062.92 charged to expense. To sustain its position on this issue the petitioner introduced as a witness one C. W. Wittman, a certified public accountant, and in connection with his testimony introduced in evidence several exhibits, consisting of calculations, tabulations, and computations previously made by the witness. Wittman did not profess to have any actual first-hand knowledge of the petitioner's properties, or of any work or any expenditures made by it for dredging and filling at any time. His testimony is based exclusively upon the result of his inspection of the petitioner's books of account, and is at best a mere expression of his opinion, based on the assumption that the dredging and filling were actually done in the manner and to the extent claimed. The evidence on this point falls far short of establishing that the petitioner is entitled to the relief it seeks, and its claim, therefore, must be denied.

The fourth issue is whether the respondent erred in including in the petitioner's income for 1920 the amount of $16,353.25 represent-

ing interest accrued in 1918 and 1919 on Federal compensation and quarterly balances due the petitioner for the use of its properties while under Federal control. The question here presented has been decided by the Board favorably to the contention of the present petitioner in *Illinois Terminal Co.*, 5 B. T. A. 15, and *Great Northern Railway Co.*, 8 B. T. A. 225. On the authority of those decisions we hold that the amount in question was not income to the petitioner in 1920.

The last question is whether the amount of $170,742.96 paid to the petitioner under the guaranty provisions of the Transportation Act of February 28, 1920, covering the six-month period of February 29 to August 31, 1920, is income within the meaning of the Sixteenth Amendment to the Constitution of the United States, and the Revenue Act of 1918. The same question was fully considered and exhaustively discussed by this Board in the case of *Gulf, Mobile & Northern Railroad Co.*, 22 B. T. A. 233, in which we held that amounts paid by the United States to a common carrier, pursuant to the guaranty provisions of the Transportation Act of 1920, constituted income to the carrier. The reasons for our holding are fully set forth in that opinion and their repetition will serve no useful purpose here. On the authority of that decision we hold that the amount of $170,742.96 was income to the petitioner in 1920.

*Judgment will be entered under Rule 50.*