APPEAL OF EXCELSIOR MOTOR MANUFACTURING & SUPPLY CO., AND ARNOLD SCHWINN & CO.

Docket No. 4686.   Decided November 20, 1926.

In the light of the circumstances in this case, *held*, that the tax return filed for 1918 was not fraudulent and that the petitioners are not liable to the assessment of the penalty provided by the statute for the filing of a fraudulent return.

*John E. Hughes, Esq.,* for the petitioners.
*Harold Allen, Esq.,* for the Commissioner.

This is an appeal from the determination of a deficiency in income and profits taxes for the calendar year 1918 in the amount of $44,370.99, plus a penalty of $22,185.50 for alleged fraud in filing a false return. The issues raised by the proceeding are:

(1) Whether the petitioners' opening inventory for the calendar year 1918 was understated by the Commissioner in computing petitioners' tax in the amount of $31,890.39.

(2) Whether or not the petitioners filed a false and fraudulent return with intent to evade taxes for the calendar year 1918.

(3) Whether the Commissioner incorrectly determined petitioners' invested capital.

(4) Whether the Commissioner should have assessed petitioners' profits tax under section 328 of the Revenue Act of 1918.

### FINDINGS OF FACT.

The Excelsior Motor Mfg. & Supply Co., hereinafter referred to as the Excelsior Motor Co., is an Illinois corporation engaged in the manufacture of motorcycles, with its offices and factory in Chicago. Arnold Schwinn & Co. is a subsidiary company engaged in the manufacture of bicycles and is also an Illinois corporation with its offices and factory located one mile from those of the Excelsior Motor Co. During the year 1918 the former company, in addition to the manufacture of motorcycles, was engaged in the manufacture of airplane engines and Handley Page bombing planes. For the year 1918 the companies filed a consolidated return in the name of the Excelsior Motor Co.

The petitioners made their income-tax return for 1917 and prior years upon a calendar year basis. The Excelsior Motor Co. took a physical inventory once a year, which was always taken on or as of October 31. The inventory used in computing the profits for the year for the purpose of the income-tax return was obtained by adding to the inventory at October 31 all the purchases for November and December and by deducting from the total the sales for November and December at selling price. In this manner the closing inventory for 1917, which was the opening inventory for 1918, was understated by the amount of the gross profits on the November and December sales. At the hearing the Commissioner admitted error in computation resulting in an understatement of the 1918 opening inventory in the amount of $31,890.39.

The fraud penalty proposed for assessment by the Commissioner for the filing of a false return for the year 1918 is based upon an understatement of the closing inventory for 1918 by approximately $93,000. This understatement occurred in the following manner:

When the Excelsior Motor Co. was working on a contract for parts for Handley Page bombing planes, the War Department sent accountants to the plant of the company to audit its books with reference to this work. After the signing of the Armistice the chief of these accountants informed the president of the petitioner corporations that he was leaving the Government service and solicited employment to make out the tax return for the Excelsior Motor Co. He was employed to do so. He inquired of the secretary of the company when the physical inventory was taken for 1917, and when advised that it was taken on October 31, 1917, he assumed that the

physical inventory which was taken December 31, 1918, had accumulated over a period of fourteen months and that it was not the correct inventory to use in determining the profits of the corporation for the year 1918. He discussed the problem with other accountants of the accounting firm with which he was employed, and was advised by one of them to go to the office of the collector of internal revenue in Chicago and make inquiry as to how to handle the matter. He went there and was advised to divide the inventory of December 31, 1918, by 14 and multiply the result by 12, and to use this sum in computing the inventory at December 31, 1918. This he did. This method resulted in an understatement of the net income for 1918.

The reason why an outside accountant was employed to make out the income-tax return of the petitioner corporations for 1918 was that, at about the time the petitioners' books for 1918 were being closed, the office managers of the two petitioner corporations advised Schwinn, the president of the corporations, that the tax laws were becoming complicated; they suggested that he employ someone to make out the tax return for these corporations. It was about this time that George E. Robertson stated to Schwinn that he was leaving the Government service to enter the employ of an accounting firm, that the firm expected him to bring some business along with him, and that he would like to be employed to make out the income-tax return for these corporations. Schwinn believed that he would be competent to make out their tax return and retained him, paying him $390 for his services.

After the return had been compiled by Robertson, it was presented to Schwinn for signature. Schwinn was assured by Robertson that the return was correct and in accordance with the law and regulations. Upon Robertson's assurance that the return was correct Schwinn signed it. The return was also signed by Schwinn's son, as vice president of the corporation. The son was production manager of the plants and signed the return as an officer upon the assurance of Robertson that the return was correct and at the request of his father.

Petitioners' inventories were kept in a loose-leaf ledger system. There was no attempt on the part of Robertson or any other person to change the record of the inventory. The return for the year 1919 shows as the inventory of January 1, 1919, the same inventory as is shown by the inventory record, which is an amount entirely different from that used by Robertson as the inventory at December 31, 1918.

It was the practice of Arnold Schwinn & Co., prior to 1917, to charge various capital expenditures to operating expenses. For the years 1909 to 1917, inclusive, the Bureau restored to invested capital items totaling $75,849.91, which had been charged to expenses. From

the year 1903 to 1909, the bookkeeper of this company itemized on the witness stand capital items charged to expense, which total $9,944.14 as follows:

| Year. | Item. | Amount. |
|-------|-------|---------|
| 1903 | Land and factory | $2,092.00 |
| 1903 | Tools and machinery | 2,340.16 |
| 1904 | Tools and machinery | 232.34 |
| 1905 | Land and factory | 240.42 |
| 1906 | Land and factory | 1,047.42 |
| 1906 | Supplies and machinery | 516.30 |
| 1907 | Land and factory | 753.91 |
| 1907 | Tools and machinery | 797.10 |
| 1908 | Land and factory | 913.20 |
| 1908 | Tools and machinery | 1,011.29 |
|       | Total | 9,944.14 |

The Excelsior Motor Co. was organized in 1900 and incorporated on January 12, 1912. Ignaz Schwinn, president of the Excelsior Motor Co. and Arnold Schwinn & Co. purchased individually the assets, including the good will, patents and trade-marks, of the Excelsior Supply Co., a corporation that had been manufacturing motorcycles for at least fifteen years prior to 1912. On February 1, 1912, he assigned and transferred to the Excelsior Motor Co., by an instrument in writing, all such assets in exchange for the capital stock of that company in the amount of $500,000. The Commissioner determined that the tangible property turned in to the Excelsior Motor Co. in 1912 had a value of at least $500,000, the full amount of the capital stock of the company.

Arnold Schwinn & Co. was organized in 1895. In 1917 and 1918 substantially all of the outstanding stock of the Excelsior Motor Co. and Arnold Schwinn & Co. was owned by Ignatz Schwinn and his immediate family. The statutory invested capital of the consolidated companies for 1918 was determined by the Commissioner to be the amount of $1,026,585.69.

The following was the amount of borrowed money of the petitioner corporations as shown by the consolidated sheets at January 1, 1918, and January 1, 1919:

|  | Jan. 1, 1918. | Jan. 1, 1919. |
|--|---------------|---------------|
| Amounts due stockholders | $461,542.47 | $461,542.47 |
| Accounts payable | 373,413.80 | 376,785.88 |

Ignaz Schwinn and his son Frank W. Schwinn owned in their own names certain patents and patent rights, which were used by the petitioners during 1918 without any royalties or compensation being paid to the owners. Among these were the following:

1. Patent No. 1,243,347, universal joint, applied for January 12, 1917, issued October 16, 1917, to Frank W. Schwinn.

2. Patent No. 1,215,877, starter for internal-combustion engines, applied for February 19, 1916, issued February 13, 1917, to Frank W. Schwinn.

3. Patent No. 1,190,956, cycle stands, applied for March 24, 1915, issued July 11, 1916, to Ignaz Schwinn.

4. Patent No. 1,198,669, motorcycle frames, applied for March 24, 1915, issued September 19, 1916, to Ignaz Schwinn.

5. Patent No. 1,268,501, kick-starter mechanism, applied for February 6, 1918, issued June 4, 1918, to Frank W. Schwinn.

All of these patents were used during 1918, and the manufacture of the Excelsior motorcycles depended largely on their use. No depreciation for the patents was ever claimed by the corporation.

Registration of the trade-mark of the Excelsior Motor Manufacturing & Supply Co. was applied for December 23, 1912, and letters of registration issued April 29, 1913. The trade-mark has been used by the company on all manufactured goods up to the present time. Excelsior motorcycles are one of the well known standard makes and are sold in practically all parts of the world.

During the year 1918 there were only three other concerns in the United States engaged in the manufacture of motorcycles and motorcycle parts. These were the Hendee Manufacturing Co., later known as the Indian Motor Cycle Co., the Cleveland Motor Cycle Co., and the Harley-Davidson Motor Co. The Harley-Davidson Co. was granted special assessment by the Commissioner under section 328 of the Revenue Act of 1918. In determining the tax liability of the Hendee Manufacturing Co. for 1918 and 1919, the Commissioner used the following computation:

|  | 1918. | 1919. |
|---|---|---|
| Gross sales | $10,792,915.19 | |
| Net income | 838,221.32 | $1,144,420.48 |
| Excess profits credit | 667,906.96 | |
| Excess profits tax | 51,094.31 | 146,722.30 |
| War profits tax | None. | |
| Consolidated invested capital | 8,311,337.02 | 8,847,617.25 |
| Borrowed money at the beginning of year | None. | |
| Borrowed money at the close of year | 242,349.76 | 115,554.97 |

The returns of the Hendee Manufacturing Co. were made out on a fiscal year basis ended August 31. For the Cleveland Motor Cycle Co. the following computations were used:

|  |  |
|---|---|
| Net income | $4,125.60 |
| Excess profits tax | None. |
| Gross sales | 548,619.15 |
| Cost of goods sold | 452,502.30 |
| Capital stock outstanding | 208,850.00 |
| Capital stock issued for patents | 50,000.00 |
| Balance sheet | 51,259.55 |
| Invested capital allowed | 158,850.00 |

Depreciation on patents was allowed by the Commissioner in computing net income but no allowance for patents was made in invested capital. The 1918 return was made out on a calendar year basis.

The consolidated gross sales of the petitioners for 1918 were divided as follows:

| | |
|---|---:|
| Motorcycles | $1,422,189.89 |
| Motorcycle parts | 380,066.64 |
| Henderson motorcycle parts | 10,639.94 |
| Side cars for motorcycles | 96,353.71 |
| Parts for Handley Page airplanes | 298,743.00 |
| Lawrence motors | 295,562.10 |
| Bicycles | 682,164.70 |

The Handley Page airplane parts and the Lawrence motors were manufactured under Government contracts. The companies had no cost-plus Government contracts.

OPINION.

SMITH: At the hearing of this appeal it was agreed between counsel for the petitioners and counsel for the Commissioner that the opening inventory of the petitioners for the taxable year 1918 was understated in the amount of $31,890.39.

The income-tax return of the petitioners for 1918 was incorrect. We are convinced, however, from the evidence of record that the officers of the corporation who signed the return were ignorant of any error in it and innocent of any fraud in connection with verifying the return. In this situation we are of the opinion that no fraud penalty is collectible from the petitioners. Possibly, the petitioners were negligent in not detecting an understatement in the closing inventory and laid themselves liable to the imposition of the 5 per cent penalty for negligence provided for in section 250(b) of the Revenue Act of 1918. But the Commissioner has not asserted this penalty and the question of the liability to it is not before the Board.

The third allegation of error on the part of the petitioners is that the Commissioner incorrectly computed invested capital for the year 1918. There are three allegations of error upon this point:

(1) That the Commissioner failed to include in invested capital for 1918 the understatement of the opening inventory in the amount of $31,890.39.

(2) That there should have been included in invested capital the depreciated cost of capital expenditures made during the years 1903 to 1909, in the amount of $9,944.14.

(3) That the Commissioner deducted from 1918 invested capital taxes for prior years which became due during the year 1918, which

is erroneous under the decision in the *Appeal of Guarantee Construction Co.*, 2 B. T. A. 1145.

The contention of the petitioners relative to the item of $31,890.39 and the depreciated cost of improvements made during the years 1903 to 1909, costing $9,944.14, is sustained. The contention of the petitioners upon the third point is denied under the authority of the decision in *Appeal of Russel Wheel & Foundry Co.*, 3 B. T. A. 1168.

The petitioners claim that there was such an abnormality in invested capital for the year 1918 as entitles them to have their profits tax computed in accordance with the provisions of section 328 of the Revenue Act of 1918. They further contend that, inasmuch as the Commissioner has refused to submit data of comparative corporations in response to a subpœna issued by this Board, and inasmuch as the petitioners have submitted evidence as to certain concerns engaged in the manufacture of motorcycles, such concerns must be held to be representative concerns in the industry, and that, in accordance with the data submitted, the profits tax of the petitioners should be determined to be not more than 10.66 per cent of the total net income.

We are of the opinion that the evidence adduced before the Board warrants a finding to the effect that the petitioners are entitled to have their tax computed under the provisions of section 328 of the Revenue Act of 1918 and that any relief to which they may be entitled thereby should be accorded to them. The Board can not find, however, as a fact, that the Hendee Manufacturing Co. and the Cleveland Motor Cycle Co. are representative corporations within the meaning of section 328 of the Revenue Act. One of the petitioners had Government contracts for bombing planes. It does not appear that either of the claimed comparatives had any such contracts. In this situation the selection of the comparatives must be left to the Commissioner, whose determination of whether the petitioners may be given relief under section 328, and the amount of such relief, if any, will be accepted as final. *Appeal of H. T. Cushman Manufacturing Co.*, 2 B. T. A. 39.

> *Judgment will be entered on 15 days' notice, under Rule 50.*